Kelly Ray TADLOCK, Appellant

v.

The STATE of Texas, Appellee

No. 06–15–00049–CR

Court of Appeals of Texas,
Texarkana.

Submitted: August 5, 2015

Decided: January 27, 2016

Frank Hughes, Attorney at Law, Greenville, TX, for appellant

Nicholas Harrison, Assistant District Attorney, William W. Ramsay, Delta, Franklin, Hopkins County District Attorney, Sulphur Springs, TX, for appellee

Before Morriss, C.J., Moseley and Burgess, JJ.

## MEMORANDUM OPINION

Memorandum Opinion by Justice Burgess

Kelly Ray Tadlock (Tadlock) was originally charged pursuant to two separate indictments, both alleging the offense of indecency with a child by contact. The first indictment charged Tadlock with the offense against a six-year-old female, whom we will call A.J.[1] The second indictment charged him with the same offense against A.J.'s older sister, whom we will call S.J.[2] *See* Tex.R.App. P. 9.10. After a bench trial, the trial court convicted Tadlock of the offense against A.J. only and sentenced him to twenty years' imprisonment.

On appeal, Tadlock contends (1) that there was insufficient evidence to prove the charged offenses and (2) that the trial court erred when it did not sua sponte conduct a competency hearing. For the reasons stated below, we overrule Tadlock's points of error and affirm the trial court's judgment.

## I. The Evidence Was Legally Sufficient to Support the Trial Court's Finding of Guilt

### A. Evidence

#### 1. Relationship of the Parties and the Outcry Statements

Katherine Yates[3] is A.J. and S.J.'s mother. At trial, Yates testified that prior to the incident at issue, she considered Tadlock as "basically being family." A.J. and S.J. referred to Tadlock as their uncle, or "Uncle Kelly." Yates described Tadlock's relationship with A.J. and S.J. as being very close. While Yates' husband, John Yates (John) was away,[4] Tadlock would occasionally watch the girls. When Tadlock came to Yates' home for dinner, he would usually spend the night.

---

1. At the time of the incident, A.J. was six years old. She was seven years old at the time of trial.

2. At the time of the incident and the trial, S.J. was eight years old.

3. To protect the identity of the minor children, we will refer to them by initials and to their mother and other relatives by pseudonyms.

4. John was incarcerated at the time of the alleged incident, and he is not A.J. and S.J.'s biological father.

On July 15, 2014, the night of the alleged incident, Tadlock spent the night at Yates' home. The next day, Yates, along with A.J. and S.J., took Tadlock back to his apartment. When they arrived back at their house about three o'clock in the afternoon, A.J. and S.J. told Yates that "Uncle Kelly was talking about sex with them." Yates asked the girls the context in which Tadlock had talked to them about sex. S.J. responded, "He was talking about you and Daddy and him and Aunt Kay."[5] A.J. told Yates that Tadlock "had touched her on her vagina [6] and made her touch him on his penis." A.J. also told Yates that the "touching" was "over the clothes" and that she had tried to "get away." Yates testified that, according to A.J., Tadlock told her not to tell anyone that he had touched her, because if she did, "they [would] call the cops on him."

S.J. told Yates that Tadlock had also touched her over her clothes and made her touch him. Yates testified that when S.J. described Tadlock's behavior toward her, A.J. stated, "[T]hat didn't happen." S.J. responded that it was "not the first time it [had] happened to her." When Yates asked S.J. when it had happened before, she told Yates that it had happened a month ago at Yates' home.

### 2. Response to the Outcry Statements and Law Enforcement Involvement

After talking to the girls, Yates telephoned her mother, Cindy, for advice on how to proceed. Cindy asked Yates to come to her house so they could discuss the situation. Before leaving to go to Cindy's residence, Yates called Tadlock and asked him "why [she] was . . . being told that he had touched [the girls]." Tadlock immediately told her that he had not done anything to the girls.

Shortly after speaking to Tadlock on the telephone, Yates went to his apartment to retrieve some dishes and return a blanket. Yates testified that when she arrived at Tadlock's apartment, she and Tadlock had a brief discussion as they exchanged the blanket and dishes through the door. During this brief encounter, Tadlock told Yates that he had only talked to the girls about marriage. Yates responded that she was "not going to ignore [her] children." Tadlock then asked Yates if she was going to call the police. Yates responded that she was not sure if she would or not and that she was not sure if her mother would contact them or not. A.J. and S.J. remained in Yates' vehicle during the exchange.

Yates eventually took A.J. and S.J. over to Cindy's home to discuss the situation. A.J. and S.J. told Cindy and Charles, Cindy's husband, what Tadlock had done to them. Cindy contacted law enforcement.

At approximately ten o'clock that evening, Sulphur Springs Police Officer Jason Reneau received a call from dispatch about a possible sexual assault of a child. After arriving at Charles and Cindy's home, Yates informed Reneau that the alleged offenses occurred while she was at work.[7] Cindy spoke with Reneau briefly and told him that Tadlock had some mental issues. Reneau did not take statements from A.J. and S.J. because department policy prohibits officers from speaking to juveniles in instances where they have made an outcry statement alleging sexual abuse. Follow-

---

5. Kay was Tadlock's former wife.

6. Later during the trial, Yates explained that both of the girls actually used the word "private."

7. The offenses were alleged to have occurred at Yates' home and not at Charles and Cindy's.

ing his brief investigation, Reneau informed Yates that he would forward the case to an investigator.

### 3. Trial Testimony

#### a. Neighbor Angela Reynolds

Angela Reynolds, who lived across the street from Yates, A.J., and S.J., testified that sometime during July 2014, she was outside and heard Tadlock tell the girls to get out of the swimming pool. The children did as they were told and went inside the house. Reynolds also went inside her house. Later, she went back outside and saw A.J. come outside of her house with "this God-awful look on her face." Reynolds stated that when she saw A.J., she got "an eerie feeling." Reynolds testified that she knew something had happened, but that she was not sure exactly what had happened until Yates told her the next day. Reynolds also stated that A.J. spoke with Reynolds' eleven-year-old daughter about what had happened with Tadlock.

#### b. S.J.'s Testimony

At trial, S.J., the oldest sister, testified first. After demonstrating that she knew the relevant parts of a female's anatomy by circling parts of a female's body drawn on a diagram, S.J. was asked if she was mad at Tadlock. S.J. answered, "Not anymore." She then stated that she did not remember why she was mad at him. When asked if Tadlock had touched her in places he should not have, S.J. nodded affirmatively, but she did not remember precisely where he had touched her. After failing to respond to several more questions, the trial court recessed the proceedings for ten minutes.

When court reconvened, S.J.'s counselor was allowed to sit next to her during her testimony. The State continued by asking S.J. whether anyone had touched her on the areas circled on a diagram of a female body, and S.J. answered, "[Y]es," but she then said that she did not remember who had touched her. After several more questions, the State asked S.J. if she remembered whether a man or a woman had touched her. S.J. stated that she did not remember. Finally, the State asked S.J, "Did [Tadlock] ever touch you in your tee-tee?" S.J. responded that she did not remember.

After several more questions, S.J. nodded affirmatively in response to the State's questions indicating that Tadlock had touched her where "he wasn't supposed to" and that it was "somewhere where [she goes] to the bathroom." S.J. then testified that Tadlock told her not to tell anybody. S.J. testified that she did not know what he touched her with. She also testified that he had done it more than once, but she did not remember how many times. Lastly, when she was asked to draw an "X" on the area where Tadlock allegedly touched her, S.J. was unable to comply with the request.

#### c. A.J.'s Testimony

Next, A.J. testified that Tadlock "used to be" her uncle, but that she was mad at him and that he was no longer her uncle. A.J. also demonstrated that she knew the relevant parts of the female anatomy on the State's diagram. She drew an "X" on the diagram when asked to identify "anywhere that somebody [had] touched her where they shouldn't have."[8] A.J. also testified that Tadlock touched her with his hand over her clothes. A.J. stated that

---

8. A.J. was asked, "Now, you drew an 'X' on the part that you pee out of; is that right?" A.J. responded affirmatively.

the incident happened on her living room couch at a time when S.J. was in her bedroom and her mother was at work. A.J. stated that Tadlock did not move his hands when he touched her and that he did not show her any part of his body. She also stated that she was telling the truth, and she denied that her parents told her to say Tadlock had touched her. Finally, A.J. stated that she was not afraid of her mother or father, but that she was afraid of Tadlock.

#### d. Child Protective Services Investigator Anna Black

Anna Black, who is an investigation supervisor for the Department of Family and Protective Services (CPS), testified that she had worked on two separate inquiries involving A.J. and S.J. One investigation was in July 2014, and the other was in November 2014.[9] The July investigation began when A.J. and S.J. made the initial outcry of sexual abuse against Tadlock. The November investigation began when Black received a second intake from the state office in Austin indicating that the children were recanting their July allegations against Tadlock.

As part of the second investigation, Black received a written summary of a recorded hotline conversation initiated by a caller, identified only as "Angie," who claimed to live across the street from Yates, A.J., and S.J.[10] The caller identified Yates' husband as the alleged perpetrator during the July incident and not Tadlock.[11] Yet, because the July investigation had revealed that Yates' husband was incarcerated during that time, the allegations made

by the caller in November were deemed "contradicted."

#### e. Defendant Tadlock

Tadlock testified that he had known A.J. and S.J. their entire lives and that he had known Yates since 1998. Tadlock stated that he had watched A.J. and S.J. for Yates on four occasions, two times at her home and two times for "a couple of hours" at his apartment while Yates was at work. Tadlock maintained that he had never touched A.J. or S.J. in an inappropriate way. Tadlock stated that during "all of July," A.J. had been saying that she was going to marry Tadlock so he would not have to be alone. Tadlock explained to A.J. that she could not marry "Uncle Kelly." Tadlock stated that he never took his clothes off, never took the girls' clothes off, and never touched them.

Tadlock explained that on July 15, 2014, the day of the alleged incident, he had been asleep on the couch in Yates' living room when A.J. came in from her mother's bedroom and tried to wake him up. When he woke up, he realized he had an erection so he instantly sat up. Tadlock stated that when he tried to sit up, A.J. tried to sit in his lap so she could give him a hug, but he scooted her off to his left in an attempt to avert the fact that he had an erection. When A.J. asked what she had felt, Tadlock "tried to play if off like it was [his cigarette] lighter." Tadlock stated that immediately after he moved A.J., he explained to her that he could not have a conversation with her about certain things, including "girl parts," "boy parts," mar-

---

9. Black supervised the November investigation, but she was not the investigator.

10. A woman named Angela Reynolds did, in fact, live across the street from Yates, A.J., and S.J.; however, Reynolds had testified ear-

lier during the trial, that she never contacted law enforcement or talked to anyone other than Yates about the incident.

11. An audio recording of the telephone conversation was admitted into evidence.

riage, or sex. At that time, S.J. entered the room, and Tadlock explained,

> I said, look, y'all two do not need to ask Uncle Kelly any questions about sex or marriage or parts or anything like that; you're asking the wrong person; you need to ask your mother. And every time you think you want to ask me a question about it, I'm going to give you the same answer; you need to talk to your mother.

Tadlock denied instructing A.J. or S.J. to never tell anyone about their conversation. Tadlock believed the girls had misinterpreted his statements as a discussion about sex.

Tadlock attempted suicide on July 18, 2014, after receiving a telephone call from Cindy telling him "she was going to call CPS and have [him] thrown in jail." Tadlock demanded to speak to Charles on the telephone, and Tadlock told him that he had done nothing wrong and "would rather die and go before God and get judged than to go through a trial or get convicted and go to prison for something [he] knew [he] would never do." [12] When asked about his opinion regarding the truthfulness of Yates, A.J. and S.J., Tadlock stated that they were all untruthful. He believed Cindy "would lie as fast as she [could]," but that Charles "would always tell the truth." Tadlock believed that Cindy and Yates' husband had coached the girls to make the statements that they made.

Tadlock also testified that he believed Cindy was the person who had called the child abuse hotline in November 2014 claiming to be "Angie." The recorded conversation was admitted into evidence and played for the court. The caller identified herself as "Angie" and stated that her daughter played with A.J. and S.J. The caller then stated that A.J. and S.J. told her daughter that Yates' husband watched "nasty" movies and that when he did, he would masturbate while the girls were in the room. The caller stated that it "was something that goes on all the time." Tadlock stated that he had been incarcerated at the time the call took place and that he did not ask anyone in his family to make that call. Tadlock testified that Reynolds and Cindy knew each other, but that he was certain that it was Cindy's voice on the recording.

#### f. Tadlock's Brother, Joseph Tadlock

Tadlock's biological brother, Joseph, testified that Tadlock had spoken with him about the incident. Joseph testified that "to the best of [his] recollection—because I've told you the problem with my memory [13]—is that he said—that [A.J.] had woke up and come over to him, and he had woke up, had [an erection] . . . and that [A.J.] jumped in [Tadlock's] lap and he put her down." Joseph testified that according to Tadlock, A.J. asked Tadlock, "What's this?" Joseph recalled Tadlock telling him that he had moved A.J.'s hand, told her she was too young, and stated that "if [A.J.] wanted to know about that or sex, then [she] need[ed] to ask her mother."

### 4. The Trial Court's Findings and Verdict

After considering all of the evidence, the trial court found Tadlock guilty of indecency with a child by contact as to A.J., and not guilty of indecency with a child by contact as to S.J. Tadlock contends, on appeal, that the trial court's verdict of guilt is not supported by sufficient evidence.

---

**12.** Tadlock also admitted that he had attempted suicide on five previous occasions.

**13.** Joseph explained that he suffered an injury that resulted in "memory issues" when a woman hit him in the head with a two-by-four while he was fighting with her husband.

## B. Standard of Review

In his first issue on appeal, Tadlock maintains that the verdict is against the great weight of the evidence. Tadlock refers to his first point of error as a factual insufficiency claim, although his brief sets forth the legal sufficiency standard. The State responded to both factual sufficiency and a legal sufficiency claims. Nevertheless, factual sufficiency reviews have been abolished in criminal cases. *See Brooks v. State,* 323 S.W.3d 893, 895 (Tex.Crim.App. 2010) (holding that "legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt"). Therefore, we will interpret and analyze Tadlock's claim as a legal sufficiency claim.

In a sufficiency review, courts examine the evidence in the light most favorable to the verdict to determine whether "any rational fact-finder could have found guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard requires a reviewing court to resolve any evidentiary inconsistencies in favor of the judgment, while keeping in mind that the fact-finder is the exclusive judge of the facts, of the credibility of the witnesses, and of the weight to be given to their testimony. *Brooks,* 323 S.W.3d at 899. Appellate courts do not reevaluate the weight of the evidence or the credibility of the witnesses. *Laster v. State,* 275 S.W.3d 512, 517 (Tex.Crim.App.2009). The fact-finder may support its verdict with reasonable inferences drawn from the evidence, and it is the fact-finder's responsibility to decide which inferences are most reasonable. *Id.* at 523. When the record supports conflicting inferences, we will presume that the fact-finder resolved any conflicts in favor of the verdict. *Merritt v. State,* 368 S.W.3d 516, 525–26 (Tex.Crim. App.2012). Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

## C. Analysis

■ In this case, the State's indictment against Tadlock alleged the offense of indecency with a child by contact. A person commits the offense of indecency with a child by contact if, "with a child younger than 17 years of age, whether the child is of the same or opposite sex, the person engages in sexual contact with [the] child or causes the child to engage in sexual contact." Tex. Penal Code Ann. § 21.11(a)(1) (West 2011). Section 21.11(c), subsections (1) and (2) state,

> "Sexual contact" means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or (2) any touching of any part of the body of a child, including touching through the clothing, with the anus, breast, or any part of the genitals of a person.

Tex. Penal Code Ann. § 21.11(c)(1), (2) (West 2011).

Here, the evidence shows that A.J. told Yates that Tadlock touched her on her "private" over her clothes and that he made her touch his genital area. A.J.

explained to Yates that Tadlock told her not to tell anyone about the incident because if she did, "they [would] call the cops on him." A.J. also described the incident to her grandparents, and when the adults asked what should be done, A.J. responded that they "should call the cops." . To the extent necessary, A.J. indicated that she understood the parts of the female anatomy when she was presented with a diagram of a female's body. She drew an "X" on the part of the diagram indicating her "private parts." She stated that Tadlock had touched her there and that he had done so over her clothing. In detail, A.J. testified that the incident happened at her home, in the living room, on the couch. She specified that when the incident happened that her sister was in her bedroom and her mother was at work. A.J. explained that Tadlock did not move his hand and that he did not show her any part of his body. Further corroborating her version of events, A.J. testified that she was not afraid of her mother or her father, but that she was afraid of Tadlock.

Tadlock agreed that an incident had happened on the date in question, but he disagreed with A.J.'s version of what had happened. After stating that he had known A.J. her entire life, Tadlock stated that he had never touched her inappropriately. As Tadlock described it, immediately after A.J. had awakened him in the living room at Yates' home, A.J. inadvertently touched his erect penis. In an attempt to explain what she had felt, Tadlock "tried to play if off like it was his cigarette lighter." Tadlock testified that at that point, the children began asking him questions about marriage and sex. Tadlock stated that he explained to A.J. and S.J. that they needed to ask their mother about those types of things. Tadlock maintains that the evidence is insufficient to prove that he committed the offense of indecency with a child by contact.

A.J.'s and Tadlock's respective versions of the facts are quite dissimilar. Yet, the trial court was free to believe or disbelieve all or part of either witnesses' version, as well as the remaining witnesses' testimony. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex.Crim.App.2010) ("[The fact-finder] is entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because he has the opportunity to observe the witness's demeanor and appearance."). In this case, the trial court believed A.J.'s version of events.

Moreover, in viewing the evidence in the light most favorable to the State, we must credit those parts of A.J.'s testimony that support the trial court's verdict. *See Brooks*, 323 S.W.3d at 898–99. The transcript reveals that the substance of A.J.'s testimony was direct and unequivocal and that it fully addressed each element of the charged offense. Accordingly, we find that there is sufficient evidence in the record upon which the trial court could have found that the State proved each element of the charged offense beyond a reasonable doubt.

We overrule Tadlock's first point of error.

## II. Competence to Stand Trial

In his second point of error, Tadlock contends that the trial court erred when it failed to sua sponte order a psychiatric examination to determine if "the assortment of drugs [Tadlock] was taking" affected his competence to stand trial following the trial court's rejection of his guilty plea.

### A. Standard of Review

█ A fundamental principle of our criminal justice system is "that a person whose mental condition is such that he

lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Due process prohibits the conviction of a mentally incompetent person. *Turner v. State*, 422 S.W.3d 676, 688 (Tex.Crim.App.2013); *Corley v. State*, 582 S.W.2d 815, 818 (Tex.Crim.App.1979) (citing *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956)). Article 46B.003(a) of the Texas Code of Criminal Procedure defines incompetency as the defendant's lack of "(1) sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against [him]." TEX.CODE CRIM. PROC. ANN. art. 46B.003(a) (West 2006).

■ The resolution of any competency issue begins with the statutory presumption that the defendant is competent to stand trial. *See* TEX.CODE CRIM. PROC. ANN. art. 46B.003(b) (West 2006) ("A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence."); *see also Reeves v. State*, 46 S.W.3d 397, 399 (Tex.App.—Texarkana 2001, pet. dism'd). Unless the competence issue is raised and incompetency is established, the presumption prevails.

Under Article 46B.004 of the Code of Criminal Procedure, an issue of competence may be raised in one of two ways. First, either party may file a motion suggesting that the defendant is incompetent to stand trial. TEX.CODE CRIM. PROC. ANN. art. 46B.004(a) (West Supp.2015). Second, the trial court may, sua sponte, raise its own motion suggesting incompetency to stand trial, and "if evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion *shall* suggest that the defendant is incompetent to stand trial." TEX.CODE CRIM. PROC. ANN. art. 46B.004(a), (b) (West Supp.2015) (emphasis added).

■ If the trial court or either party raises a suggestion of incompetence, then the trial court shall hold an informal inquiry to determine "whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." TEX.CODE CRIM. PROC. ANN. art. 46B.005(a) (West 2006). If, as a result of that informal inquiry, "the trial court determines that evidence exists to support a finding of incompetency, the trial court shall order" a mental evaluation under the provisions of Article 46B.021 through 46B.027. *Gray v. State*, 257 S.W.3d 825, 827 (Tex.App.—Texarkana 2008, pet. ref'd). And, upon completion of the evaluation, unless both parties and the trial court agree that the defendant is incompetent, the trial court must hold a trial under the provisions of Articles 46B.051 through 46B.055 before it can find that the defendant is incompetent.[14] TEX. CODE CRIM. PROC. ANN. art. 46B.005(c) (West 2006).

Consequently, there are three steps involved in raising and resolving an issue of incompetency to stand trial: (1) a suggestion of incompetency, (2) an informal inquiry, and (3) a competency trial under Articles 46B.051 through 46B.055. Yet, a trial

---

**14.** In other words, because a defendant is presumed to be competent to stand trial under Article 46B.003(a), a trial court may find the defendant competent based on an expert's evaluation, but unless both parties and the trial court agree that the defendant is incompetent, the trial court cannot find that he is without first holding a competency trial. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.003(a), 46B.005(a), (b), (c).

court is not required to engage in all three steps in every case. The process is progressive, meaning a trial court only moves to the next step if the requirements of the preceding step were met. Thus, a competency trial is not required unless the formal inquiry establishes "that evidence exists to support a finding of incompetency," *Gray*, 257 S.W.3d at 827, and the parties and the trial court do not agree that the defendant is incompetent. Similarly, an informal inquiry is not required unless the trial court observes or is presented with sufficient evidence suggesting incompetency.

■ Yet, the burden of presenting sufficient evidence to establish a "suggestion of incompetency" is not onerous. Although a motion suggesting incompetency "may be supported by affidavits setting out the facts on which the suggestion is made," TEX.CODE CRIM. PROC. ANN. art. 46B.004(a), or by live testimony, it "may [also] consist solely of a representation from any credible source that the defendant may be incompetent." TEX.CODE CRIM. PROC. ANN. art. 46B.004(c–1) (West Supp.2015). In fact, "[e]vidence suggesting the need for an informal inquiry may be based on observations made in relation to one or more of the factors described by Article 46B.024[15] or on any other indication that the defendant is incompetent within the meaning of Article 46B.003." *Id.*[16] Nevertheless,

15. Article 46B.024 lists the following factors to be considered by an expert appointed to perform an evaluation under Article 46B.005(a):

(1) the capacity of the defendant during criminal proceedings to:

(A) rationally understand the charges against the defendant and the potential consequences of the pending criminal proceedings;

(B) disclose to counsel pertinent facts, events, and states of mind;

(C) engage in a reasoned choice of legal strategies and options;

(D) understand the adversarial nature of criminal proceedings;

(E) exhibit appropriate courtroom behavior; and

(F) testify;

(2) as supported by current indications and the defendant's personal history, whether the defendant:

(A) is a person with a mental illness;

(B) is a person with an intellectual disability;

(3) whether the identified condition has lasted or is expected to last continuously for at least one year;

(4) the degree of impairment resulting from the mental illness or intellectual disability, if existent, and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner; and

(5) if the defendant is taking psychoactive or other medication;

(A) whether the medication is necessary to maintain the defendant's competency; and

(B) the effect, if any, of the medication on the defendant's appearance, demeanor, or ability to participate in the proceedings.

TEX. CODE CRIM. PROC. ANN. art. 46B.024 (West Supp. 2015).

16. Prior to the enactment of Article 46B.004(c–1) in 2011, the amount of evidence required to establish a "suggestion of incompetency" was much higher. As explained by our sister court in Corpus Christi:

Evidence sufficient to prompt a competency hearing or inquiry must raise a "bona fide doubt" in the mind of the trial judge as to the defendant's competency to stand trial; a bona fide doubt exists if the evidence indicates recent severe mental illness, or at least moderate mental retardation, or truly bizarre acts by the defendant.

*Salahud–din v. State*, 206 S.W.3d 203, 208 (Tex. App.–Corpus Christi 2006, pet. ref'd) (citing *Collier v. State*, 959 S.W.2d 621, 625 (Tex.Crim.App.1997) (en banc); *Mata v. State*, 632 S.W.2d 355, 359 (Tex.Crim.App.1982)); *see also Reeves*, 46 S.W.3d at 400. Article 46B.004(c–1) eliminated the burden of raising a "bona fide doubt." Under the current version of Article 46B.004, "the court is not required to have a bona fide doubt about the competency of the defendant." *See* TEX. CODE CRIM. PROC. ANN. art. 46B.004(c–1).

the Texas Court of Criminal Appeals has also held that mental illness, by itself, does not equate to incompetence to stand trial. As explained by the Court of Criminal Appeals, only "when a defendant's mental illness operates in such a way as to prevent him from rationally understanding the proceedings against him or engaging rationally with counsel in the pursuit of his own best interest" does such mental illness rise to the level of incompetence to stand trial. *Turner*, 422 S.W.3d at 691.[17]

■ In this case, Tadlock alleges that the trial court erred in failing to conduct an informal inquiry into his competence to stand trial under Article 46B.004(b). However, neither Tadlock nor the State filed a motion or presented affidavits or live testimony suggesting incompetence, and no "credible source" represented to the trial court that Tadlock was incompetent.[18] Thus, resolution of this case turns on whether there is sufficient evidence in the record upon which the trial court should have determined that Tadlock was incompetent "based on observations made in relation to one or more of the factors described by Article 46B.024 or on any other indication that [Tadlock was] incompetent within the meaning of Article 46B.003." Tex.Code Crim. Proc. Ann. art. 46B.004(c–1). We review a trial court's failure to conduct a competency inquiry under an abuse of discretion standard. *Moore v. State*, 999 S.W.2d 385, 393 (Tex. Crim.App.1999). A trial court abuses its discretion only if its decision is arbitrary or unreasonable. *Id.*

## B. The Evidence

### 1. The First Pretrial Hearing

Following two pretrial hearings, Tadlock informed the trial court that he wanted to plead guilty to the charges contained in both indictments. Prior to taking his pleas, the trial court informed Tadlock that the documents containing the plea agreements were "both for the offense of indecency with a child by contact." The trial court explained that each offense was a second degree felony and that "they involved two different named complaining witnesses." Tadlock indicated that he understood. Following a brief explanation of Tadlock's rights, the trial court continued,

> Knowing that you have that right to a jury trial and all the rights that go along with it, which includes a right to file an appeal of a judgment if you weren't satisfied with the outcome of your trial, am I correct in understanding you wish to waive or give up that right and go forward with a plea of guilty to two indictments in exchange for this agreed upon sentence recommendation commonly referred to as a plea bargain agreement? Is that correct.

Tadlock responded, "Yes, sir."

After noting that Tadlock's first attorney had filed a motion to withdraw due to a conflict and that a new attorney had

---

**17.** Because the standard for establishing a "suggestion of incompetency" is low and may be based on the trial court's own observations or on the representation of any "credible source," the trial court has the discretion to simply order a mental evaluation without actually convening an informal inquiry and requiring the parties to present evidence. However, if the trial court convenes an informal inquiry, the requisite suggestion of incompetency must be established before the trial court is required to order a mental evaluation.

**18.** In fact, defense counsel suggested the opposite conclusion when he stated that he had "thoroughly investigated whether or not [there were] issues of competency." Counsel stated to the trial court, "[I]t's my understanding that he wanted to proceed in this fashion, and I am prepared either way, Your Honor."

been appointed to assist Tadlock, the trial court asked Tadlock if he still intended to continue with his pleas. Tadlock indicated that he did. Tadlock's newly appointed counsel then informed the trial court that he had been appointed in excess of ten days, that he had consulted with the investigators and read the reports, and that he had previously participated in an "extensive conversation with Mr. Tadlock." Tadlock's counsel continued,

[Defense Attorney]: And I feel I'm prepared to go forward in this fashion based upon—I will also inform the Court that based upon my investigation thus far, I am aware of Mr. Tadlock's medications, his—and have thoroughly investigated whether or not [there are] issues of competency—although I'm not an expert, I am aware and Mr. Tadlock should be able to recite to the Court all the medications he's on, any maladies that he's had over the course of the years.

But, it's my understanding that he wanted to proceed in this fashion, and I am prepared either way, Your Honor.

The trial court responded,

THE COURT: Okay. And he brings up some issues that I've not been—that have not been addressed before, and that is certain physical or mental—I'm not sure—issues that you may have. As we sit here, I'm not aware of anything that would deem you to be incompetent to stand trial. You're on medication for what, Mr. Tadlock?

Tadlock answered that he was on a total of ten different medications, including medications for acute chronic depression, high blood pressure, mood stabilization, and sleeping issues. Tadlock explained that he used an inhaler for asthma, suffered from disk disease and degenerative bone disease, and that he was "physically disabled, not mentally."

The trial judge stated that he had worked in the mental health field for years and that he was aware that depression could become so severe that it would "manifest psychotic features." The trial court opined that he was not "seeing any indication of that whatsoever." The trial court asked Tadlock if he felt like he understood the proceedings against him, and Tadlock responded, "I understand." Tadlock further informed the trial court that he understood the roles of the various participants during the hearing. Tadlock's trial counsel then represented to the trial court that in his opinion, Tadlock was aware of how the medications affected him and was "in full, I guess capacities."

Following the trial court's inquiries and plea admonishments, Tadlock pled guilty to indecency with a child by contact in each case. The trial court informed Tadlock that pursuant to his guilty pleas, the punishment range for the alleged offenses was two to twenty years' confinement in the state penitentiary. The trial court asked Tadlock if he understood the contents of the written documents [19] he had signed, and Tadlock indicated that he did. Tadlock's trial counsel also asked him if he understood everything, or if he had any confusion about anything that he was asked. Tadlock responded that he understood and that he was not confused about the proceedings. The trial court found that Tadlock's pleas and waivers of his rights were made "freely, voluntarily, knowingly, and competently." After accepting Tadlock's pleas, the trial court deferred findings of guilt and ordered the Hopkins County Community Supervision and Corrections Department to proceed

---

19. These documents included written plea admonishments, written waivers of his rights, judicial confessions, and the actual plea agreements.

with a pre-sentence investigation (PSI) and report.

### 2. The Second Pretrial Hearing

On December 31, 2014, Tadlock again appeared before the trial court. At that time, the trial court explained,

> Now, I informed the attorneys [at the plea hearing] that while they may have had an agreement, I don't even consider plea agreements for second-degree felonies and above that involve a victim until a PSI, presentence investigation report, has been prepared and I've reviewed that, and only then will I announce whether or not I'm going to follow the plea agreement. That's just my own personal philosophy.

The trial court then stated that it had come to his attention, via an email from a community supervision officer, that during the PSI interview, Tadlock denied committing the offenses and "said the only reason he pled true was because he didn't want to go to prison, felt pressured by attorney, and didn't see how he could prove he was innocent." The trial court went on to say, "And as I tell people, this is not Let's Make a Deal, and I'm not Monty Hall." With that, the trial court informed Tadlock that he did not "take guilty pleas from innocent people." The trial court reminded Tadlock of his testimony during the plea hearing "that he [was] pleading guilty freely and voluntarily" and because he was guilty.

The trial court informed Tadlock that the only possible way he would accept his guilty pleas was "if [Tadlock could] convince [the trial court] that going forward would be right because what [the community supervision officer] report[ed] to [the trial court was], in fact, not the truth." Tadlock responded, "To be honest with you, I'm conflicted." The trial court then read the substantive parts of both indictments to Tadlock and asked, "Is that true?" After it became apparent to the trial court that Tadlock needed to sit down, Tadlock stated, "I'm overwhelmingly anxiety [sic] right now." He continued, "My anxiety level is through the roof right now, Your Honor." Tadlock then recited the litany of drugs he was taking for his various ailments, which included anxiety, asthma, emphysema, and chronic bronchitis. The trial court responded,

> Okay. Well, again—and I'll make the same statement, having worked in the field a long time, I don't see anything about your mental status that would render you what the law would call incompetent to stand trial. There's not even the mere suggestion. It's never been suggested to me, and it's clear that a person can be on a great deal of medication and still participate in their defense, which we need.
>
> But I can tell you that your mere hesitation to acknowledge the veracity of the allegations in your indictment[s] cause me great concern, and that's what trials are for. I understand why anybody would be anxious about going to trial. I do understand that.

Tadlock responded, "It scares me to death." The trial court again stated that it could not accept pleas of guilty "from somebody who maintains that they're only doing it to avoid the possibility of adverse consequences." Tadlock then stated, "I'm not just—I'm not guilty—I—I believe that if the girls say that I violated them in some way, then I must have." The trial court informed Tadlock that his statement was insufficient to support his convictions based on guilty pleas and set both cases for a jury trial. On January 21, 2015, Tadlock signed waivers of a jury trial in each case. The trial court found that Tadlock "freely, voluntarily, knowingly, and

competently" made his decision to waive a jury trial and accepted those waivers.

## C. Analysis

█ In this case, there is no evidence that Tadlock was diagnosed with any type of mental disease or defect. There is evidence of a suicide attempt [20] and possible depression, but Tadlock himself explained to the trial court that his disabilities were physical, not mental. The record is void of evidence showing that Tadlock did not understand the charges against him or the proceedings against him. To the contrary, the evidence shows he understood the charges, cooperated fully with his counsel, and could effectively communicate with him. His counsel informed the trial court that he believed Tadlock was competent. The trial court questioned Tadlock about the medications he was taking, and it was determined that they did not have an ad-verse effect on his decision-making process.

Likewise, there was nothing in the record to indicate that he was uncooperative or disrespectful to the trial court or to any of the participants involved. Although the evidence shows that he was extremely anxious during one portion of the proceedings, Tadlock neither behaved in an obstinate fashion nor interrupted the proceedings by inappropriately speaking out or by using profane language. He did not threaten a witness or act in a bizarre fashion. Tadlock appropriately answered the questions he was asked during both the plea process and while testifying at trial. While Tadlock may have been suffering from depression and clearly was taking a variety of medications for his physical disabilities, those factors did not operate in such a way to prevent him from rationally understanding the proceedings against him or engaging rationally with his trial counsel.[21]

20. The trial court heard testimony that Tadlock had attempted suicide following a telephone conversation with Cindy during which she informed him she was going to contact "CPS and have [him] thrown in jail."

21. In support of his argument that the trial court erred when it failed to conduct an informal inquiry into his competence to stand trial, Tadlock surprisingly points to Reeves. In that case, Reeves pled guilty to robbery as part of a plea agreement. *Reeves*, 46 S.W.3d at 399. The trial court assessed punishment at ten years' confinement, but suspended the imposition of sentence and placed Reeves on community supervision for eight years. *Id.* Less than a month later, the State filed a motion to revoke Reeves' community supervision. *Id.* Following a hearing on the State's motion, the trial court found five of the State's allegations true, revoked Reeves' community supervision, and sentenced her to ten years' confinement. *Id.* Reeves appealed the trial court's decision arguing that it erred in failing to conduct a competency hearing. *Id.* Prior to the revocation hearing, Reeves filed a motion to have a court-appointed psychiatrist examine her and requested a hearing as to her competence. At the hearing on her motion for appointment of a court-appointed psychiatrist, Reeves' mother testified that Reeves' birth mother was an alcoholic and drank heavily when she was pregnant with Reeves; that Reeves had a seven-year history of drug addiction; and that Reeves attempted suicide on at least one occasion. *Id.* at 400. On cross-examination, Reeves' mother testified that she had seen Reeves almost every day while she was out of jail on community supervision and that she had not exhibited bizarre or psychotic behavior, other than her drug addiction. *Id.* Based on the evidence, the trial court denied Reeves' motion. In overruling Reeves' first point of error on appeal, we stated,

> Viewing the evidence in the light most favorable to Reeves' position, we conclude the trial court did not err in failing to conduct a competency hearing. There was no testimony regarding Reeves['] present ability to consult with her lawyer with a reasonable degree of rational understanding or whether she had a rational as well as factual understanding of the proceedings against her. There was evidence regarding her drug addiction and a suicide attempt, but this evidence did not reflect on her ability to understand or participate in the proceedings on that day.

Accordingly, we do not find that there is sufficient evidence in the record upon which the trial court should have determined that Tadlock was incompetent "based on observations made in relation to one or more of the factors described by Article 46B.024 or on any other indication that [Tadlock was] incompetent within the meaning of Article 46B.003." TEX.CODE CRIM. PROC. ANN. art. 46B.004(c–1). Consequently, the trial court did not abuse its discretion by failing to sua sponte conduct an informal competency hearing. We overrule Tadlock's second point of error.

## III. Conclusion

We affirm the trial court's judgment of conviction.

*Id.* Thus, although there was evidence regarding her drug addiction and a suicide attempt—just as there was evidence here that Tadlock had attempted suicide and was taking various medications—the evidence did not demonstrate that Reeves was unable to understand or participate in the proceedings or assist her attorney in representing her, and the trial court was not required to hold an informal inquiry.